RONALD J. FISHER (State Bar No. 298660)
E-Mail:     rfisher@sideman.com
ELLEN V. LEONIDA (State Bar No. 184194)
E-Mail:     eleonida@sideman.com
SIDEMAN & BANCROFT LLP
One Embarcadero Center, Twenty-Second Floor
San Francisco, California 94111-3711
Telephone:     (415) 392-1960
Facsimile:     (415) 392-0827

Attorneys for PLAINTIFF
TRILOBIO, INC.

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN FRANCISCO DIVISION

| | |
|---|---|
| TRILOBIO INC., a Delaware corporation,<br><br>Plaintiff<br><br>v.<br><br>KEONI GANDALL, an individual, and Nanala, Inc. a Delaware corporation.<br><br>Defendant | **COMPLAINT**<br><br>**JURY TRIAL DEMANDED**<br><br>Trial Date: Not Yet Set |

Plaintiff Trilobio, Inc. ("Trilobio") alleges against Defendants Keoni Gandall ("Gandall") and Nanala, Inc. ("Nanala"), as follows:

## INTRODUCTION

1.     Trilobio is a start-up biotech company that is revolutionizing genetic research by combining innovations in hardware, software, machine learning, and genetic engineering to fully automate biotech research and development. These advances will make cutting-edge cancer treatments and vaccines that depend upon genetic synthesis and engineering exponentially more affordable, reliable, and replicable. Other technology that Trilobio is creating will remove human error from genetic testing through automation and self-correcting artificial intelligence, advances that have enormous implications for our criminal justice system and medical labs worldwide.

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

LAW OFFICES

SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

2.    Keoni Gandall is a former officer of Trilobio who was fired because he failed to complete projects, worked on his own pet side projects instead of the mission-critical work Trilobio directed him to do, failed to recruit the important industry advisor that he promised he would, failed to discover potential customers or spark interest from them in Trilobio, and was unproductive relative to his peers at Trilobio.

3.    Trilobio advised Gandall of these failings in a November 2022 performance review. Gandall responded to that review with profanity and insubordination, writing (*inter alia*) "[t]his isn't a fucking competition," "[t]his is kinda BS," and "[w]hat the fuck dude, I ASKED you and you said you had it handled. This is NOT on me."

4.    Despite Gandall's insubordinate and unprofessional response to Trilobio's feedback, Trilobio gave Gandall an opportunity to improve sufficiently to warrant continued employment. But Gandall did not. Trilobio accordingly terminated him in February 2023.

5.    Aware of his impending termination, Gandall surreptitiously stole all of the intellectual property he had worked on during his time at Trilobio, subsequently starting his own company—based entirely on stolen Trilobio intellectual property.

6.    After he was fired, Gandall continued to unlawfully access Trilobio's systems and assets for his own benefit. He attempted to raid Trilobio's bank account with First Republic, but was foiled by the fact that Trilobio had changed access credentials to that account just one day prior. Gandall also accessed and changed the login passwords for various databases and communications platforms used by Trilobio and took them for his own.

7.    Gandall then launched Defendant Nanala, Inc. and began using Trilobio information for Nanala's benefit. Gandall pitched to investors technology that Trilobio was developing that would exponentially decrease the cost of synthesizing specific sequences of genetic material. This technology used Trilobio software and robotics to create long specific sequences from shorter DNA sequences that could be bulk purchased inexpensively, known as "oligo pools." This use of oligo pools and Trilobio technology to create longer DNA sequences necessary for medical research (hereafter, the "Oligo Pool Technology") is exponentially cheaper than current means of creating long genetic sequences, and has massive implications for gene

SIDEMAN & BANCROFT LLP
LAW OFFICES
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

therapies (among other applications). Gandall himself wrote memoranda emphasizing how transformative and important the Oligo Pool Technology is:

### Oligo pool construction

This is possibly one of our most important technologies. I think we should at least spend 1-2 months trying to figure it out. If we can't, drop it and keep working on the parts. We should have a goal to at least use the read-until API for a real oligo pool by Ginkgo ferment, and perhaps file a provisional patent on it.

To recap:

1. Spend 1-2 months trying to get working
2. File provisional patent and try read-until API by Oct 28th (1 month)

8.      Gandall also disclosed to competitors Trilobio's robotic artificial intelligence technology for conducting DNA PCR testing, (hereafter, the "AI BioRobotics Technology") which revolutionizes biotechnology by combining proprietary sensors and artificial intelligence to dramatically improve the processes involved in genetic engineering with automation.

9.      Gandall pitched the Oligo Pool Technology and the AI BioRobotics Technology to Trilobio's prospective and current investors (and competitors) as his own ideas, thereby materially breaching his Confidential Information and Invention Assignment Agreement. Gandall has also given presentations wherein he takes credit for the Oligo Pool Technology and has posted about it on Twitter. While Gandall is free to embark on new business ventures, he cannot use Trilobio technology and invention to do so.

10.     Accordingly, Trilobio files this action to put a stop to Gandall's wrongful conduct, prevent further misuse of Trilobio's proprietary information and trade secrets, and to recover all information taken by Gandall through his unlawful and unauthorized access of Trilobio systems.

### THE PARTIES

11.     Plaintiff Trilobio, Inc. is a Delaware corporation, with a principal place of business in San Francisco, California. Trilobio was co-founded in 2021 by Roya Amini-Naieni, Maximilian Schommer, and Defendant Gandall.

12.     On information and belief, Defendant Keoni Gandall is an individual residing in Huntington Beach, California at his parent's home. Gandall is the sole founder and owner of

Defendant Nanala, Inc., ("Nanala") a Delaware corporation headquartered at Gandall's parent's home in Huntington Beach.

**JURISDICTION AND VENUE**

13.    This Court has original subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1836(c) because Trilobio alleges claims for, *inter alia*, violations of the Computer Fraud and Abuse Act and the Defend Trade Secrets Act . This court has supplemental subject-matter jurisdiction over the pendent state law claims under 28 U.S.C. § 1367, because these claims are so related to Plaintiffs' claims under federal law that they form part of the same case or controversy and derive from a common nucleus of operative facts.

14.    The Court has personal jurisdiction over Defendant Gandall because Gandall is and was, at all times mentioned in this Complaint, a resident of California. The Court has personal jurisdiction over Defendant Nanala because it is headquartered in Huntington Beach, California. The Court also has personal jurisdiction over Defendants because (1) the alleged tortious conduct occurred in California; and (2) Gandall entered into an agreement, the Confidential Information and Invention Assignment Agreement ("CIIAA") in the state of California and which the parties expressly agreed, pursuant to Section 11, that the Agreement is to be governed by the State of California.

15.    Venue in his district is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claim occurred in this district. Plaintiff Trilobio's principal place of business is in the district and Trilobio entered into its agreement with Defendant in this district.

**FACTS**

**A.    The Founding of Trilobio**

16.    Trilobio was founded in 2021, with the goal of fully automating synthetic biological research and testing, making it more accessible for medical labs. Trilobio's automation will revolutionize medicine, from speeding vaccine development to creating gene therapies and eventually even allowing for personalized medicine.

SIDEMAN & BANCROFT LLP
LAW OFFICES
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

17.     Trilobio also develops processes to reduce the cost of assembling and reconstructing DNA by using highly sophisticated robots, equipped with sensors and artificial intelligence, for full end-to-end automation of synthetic biology modules and protocols. Its goal is to deploy fully automated labs that dramatically improve data quality and reproducibility using machine learning.

18.     Roya Amini-Naieni is the CEO and a founder of Trilobio. Amini-Naieni is an accomplished mathematician and molecular biologist who studied mathematical and computational biology at Harvey Mudd College on a prestigious merit scholarship before departing to found Trilobio. She founded and directed the HMC BioMakerspace, a genetic engineering and robotics laboratory at Harvey Mudd that was awarded multiple research grants from the President of Harvey Mudd, and earned the Outstanding Student Organization award at the college. Amini-Naieni has served on numerous research teams, including at Asimov, Inc., Harvey Mudd College, and the University of Washington. She has presented her work at multiple impactful venues, including the Harvard Kennedy School of Government. At 25 years old, Amini-Naieni has already been featured in Forbes, The Nation, and SF Business Times.

19.     Schommer is a similarly accomplished robotics engineer, with experience in robotics, electrical, software development, and computational geometry. Prior to founding Trilobio, he designed and developed robotics at Machina Labs, where he was employee number six and instrumental in designing their signature robots, including Machina's dual 7 – axis robot arm path planning software. Schommer led a research team at NASA and has worked for Relativity Space, Aerodyne Research, and Onshape.

20.     Amini-Naieni and Schommer have been recognized in Forbes 30 under 30 for Trilobio's contribution to manufacturing and industry.

21.     Amini-Naieni and Schommer collaborated on multiple projects in the years before founding Trilobio.

22.     Amini-Naieni met Gandall at a conference at MIT in 2017, when both were teenagers. Though they shared an interest in genetic engineering, their careers took different paths: Amini-Naieni went on to study mathematical and computational biology at Harvey Mudd College

1  and have an incredibly successful career in her chosen field. Gandall did not attend college and

2  found work as a lab technician.

3        23.     In 2021, Amini-Naieni and Schommer talked to Gandall about joining them to start

4  Trilobio.

5        24.     Gandall's most significant potential contribution to Trilobio was his promise that

6  he could connect Trilobio with Professor Andrew Endy, a renowned synthetic biologist and

7  professor of bioengineering at Stanford, who was also Gandall's employer at the lab where he

8  worked as a technician. Gandall assured Amini-Naieni and Schommer that he could get Professor

9  Endy to act as an advisor to Trilobio.

10        25.     In the field of biotech start-up companies, advisors play a critical role. They not

11  only guide the research and direction of the company, but also are the key to introductions and

12  credibility with investors, which are critical to sparking investment interest in a biotech start up.

13        26.     Gandall's promise to obtain Professor Endy as an advisor was the main reason he

14  was invited to be a co-founder of Trilobio. Professor Endy had served as an advisor for Gingko

15  Bioworks, which became a biotech company worth over $500 million. He also served on the US

16  National Science Advisory Board for Biosecurity, the Committee on Science Technology & Law,

17  the International Union for the Conservation of Nature's Synthetic Biology Task Force, the

18  Pentagon's Defense Innovation Board, and the World Health Organization's Advisory Committee

19  on Variola Virus Research. Esquire magazine recognized Professor Endy as one of the 75 most

20  influential people of the 21st century. His willingness to serve as Trilobio's advisor would have

21  been a huge accomplishment for the start-up.

22        27.     Gandall also represented that he possessed the necessary skills and expertise to

23  oversee Trilobio's lab operations.

24        28.     Based on these representations, Amini-Naeini and Schommer agreed to accept

25  Gandall as a co-founder of Trilobio.

26  **B.     Gandall's Trilobio Contract**

27

28

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

29.    On September 24, 2021, Gandall executed a Confidential Information and Invention Assignment Agreement ("CIIAA") as a condition of his employment at Trilobio and in consideration of his employment and receipt of compensation. (See Ex. A).

30.    In his CIIAA, Gandall agreed to "hold in strictest confidence . . . and not to disclose to any person, firm, corporation or other entity, without written authorization from the Company" all "Confidential Information that I obtain, access or create" during the term of his relationship with Trilobio, "whether or not during working hours." (Ex. A, ¶ 2).

31.    Specifically, the CIIAA bound Gandall to not disclose any company "Inventions," defined as any "discoveries, developments, concepts, designs, ideas, know how, improvements, inventions, trade secrets and/or original works of authorship, whether or not patentable, copyrightable or otherwise legally protectable," including but not limited to, "any new product, machine, article of manufacture, biological material, method, procedure, process, technique, use, equipment, device, apparatus, system, compound, formulation, composition of matter, design or configuration of any kind, or any improvement thereon." (Ex. A, ¶¶ 2, 3).

32.    The CIIAA bound Gandall to not disclose any "technical data, trade secrets, know-how, research, product or service ideas or plans, software codes and designs, algorithms, developments, inventions, patent applications, laboratory notebooks, processes, formulas, techniques, biological materials, mask works, engineering designs and drawings, [and] hardware configuration information" to anyone outside of Trilobio. (Ex. A, ¶ 2)

33.    Gandall expressly certified that he had no pre-existing interest in any Invention that related in any way to Trilobio's proposed business. Gandall further agreed to waive any claim of ownership of any such Inventions, making them the property of Trilobio. (Ex. A, ¶ 3, Exhibit A).

34.    The CIIAA further provided that Gandall's employment at Trilobio was at-will and Trilobio could terminate his employment "at any time for any reason or no reason." (Ex. A, ¶ 8).

**C.    Gandall's Performance and Termination**

35.    When Gandall started working at Trilobio, it became apparent that he had neither the skills, nor the connections he had represented when applying for the job.

36.    Gandall spent months on unspecified "projects" that went nowhere.

SIDEMAN & BANCROFT LLP
LAW OFFICES
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

LAW OFFICES

SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

37.     Gandall promised to complete projects which were never completed.

38.     Gandall abandoned work without finishing it.

39.     During part of the time Gandall served as CFO of Trilobio, he paid himself more than Amini-Naieni and Schommer and concealed that fact from his co-founders.

40.     Gandall also failed to contribute to the administration of Trilobio. He did not help with hiring, investor updates, or customer discovery interviews, despite representing that he would.

41.     Finally, Gandall had falsely represented that he could and would engage Professor Endy as an advisor for Trilobio. In fact, Gandall never asked Professor Endy to be an advisor and never even discussed Trilobio with Professor Endy.

42.     Trilobio confronted Gandall with his poor performance in a November 2022, with a written performance review.

43.     Gandall responded to his performance evaluation in writing, with an expletive-laden rant, including, "[t]his isn't a fucking competition," "[t]his is kinda BS," and "[w]hat the fuck dude, I ASKED you and you said you had it handled. This is NOT on me."

44.     Although Gandall took issue with some parts of his negative work evaluation, he later acknowledged to Trilobio that "it is within your rights to terminate me."

45.     Gandall was terminated from Trilobio on February 21, 2023.

**D.     Gandall Steals and Disseminates Trilobio's Confidential Information**

       **1.     Theft of Trilobio's Intellectual Property**

46.     Prior to his termination, Gandall, without authorization, copied massive amounts of Trilobio's confidential research and code.

47.     Trilobio stores its research in GitHub repositories. These repositories, which store Trilobio trade secrets and intellectual property, are private and protected by default. Gandall had access to those repositories when he was employed at Trilobio. Part of Gandall's duties as an employee of Trilobio was contributing research and code to the GitHub repositories.

48.     Prior to his termination, Gandall copied multiple GitHub repositories containing Trilobio's confidential information and trade secrets. He did so without authorization and without

1    informing Trilobio. He then used Trilobio's confidential information for his own benefit and the

2    benefit of his company, Nanala.

3                    **2.    Unauthorized Access to Board Documents**

4        49.    Prior to his termination, Gandall was granted limited, one-time access to Amini-

5    Naieni's Trilobio email account in order to perform administrative tasks for Amini-Naieni related

6    to Trilobio (e.g., clearing the spam folder). Gandall continued to use that access, thus exceeding

7    his authorization. Gandall used Amini-Naieni's credentials to access a document that Trilobio was

8    about to send to its board regarding Gandall's poor performance.

9        50.    After being terminated from Trilobio, Gandall continued to disclose the

10   confidential information of Trilobio to third parties without authorization and to market Trilobio's

11   inventions as his own.

12                   **3.    Theft of the AI BioRobotics Technology**

13       51.    Gandall disclosed to (at least) Christian Ponce, a former employee of Crescent

14   Fund (an investor in Trilobio), confidential information regarding Trilobio's research regarding

15   automation and surveillance of PCR DNA testing (the "AI BioRobotics Technology").

16       52.    The AI BioRobotics Technology is a Trilobio invention which will revolutionize

17   genetic research by combining innovations in hardware, software, and genetic engineering. The AI

18   BioRobotics Technology creates bio-robots which are fitted with sensors enabling them to monitor

19   and modify their behavior as they conduct genetic testing. The bio-robots use AI to improve their

20   performance, learn from their mistakes, and diagnose errors in testing processes that would

21   otherwise be undiscovered.

22       53.    Ponce has since launched a company, Tetsuone Scientific, based on the AI

23   BioRobotics Technology.

24                   **4.    Theft of the Oligo Pool Technology**

25       54.    Gandall also stole and disseminated Trilobio's confidential information related to a

26   unique manner of using oligo pools to create gene sequences (the "Oligo Pool Technology").

27   Trilobio's Oligo Pool Technology combines innovations in hardware, software, and genetic

28

engineering to create long strands of DNA, necessary for genetic research, out of oligo pools (inexpensive collections of shorter strands of DNA).

55.    While employed at Trilobio, Gandall, explicitly recognized the value of the Oligo Pool Technology and the importance of keeping it secret, writing, "This is possibly one of our most important technologies."



56.    Despite knowing the value of the Oligo Pool Technology and the importance of safeguarding this intellectual property, Gandall stole code from Trilobio's GitHub repository related to the Oligo Pool Technology. He then used this confidential information and attempted to market it as his own.

57.    Gandall pitched the Oligo Pool Technology to multiple clients after his termination from Trilobio and posted about it on Twitter. On or about September 15, 2023, Gandall even gave a virtual presentation at the J. Craig Venter Institute Minimal Cell Workshop during which he falsely claimed that the Oligo Pool Technology was his own:



58.    Gandall further stole Trilobio's confidential information regarding the Oligo Pool Technology by transferring administrative privileges to a spreadsheet regarding the Oligo Pool Technology from his Trilobio email account to his personal email account, thereby denying Trilobio access to its own spreadsheet.

### 5. Dissemination of Trilobio's Confidential Information to Customers and Investors

59.    Prior to his termination, Gandall had been meeting, as a representative of Trilobio, with a Trilobio investor. After his termination, Gandall continued to meet with that investor and disclosed Trilobio's confidential information and inventions for his own benefit, without authorization. On April 18, 2023, more than a month after Gandall's termination, the investor (apparently inadvertently) emailed Gandall's Trilobio email address with the comment, "let's start this up again when you're ready with the new enterprise ;)."

60.    After his termination, Gandall disseminated Trilobio's confidential information to multiple former and/or prospective clients of Trilobio, as well as potential investors in Trilobio. At least one of these customers subsequently terminated its relationship with Trilobio.

### 6. Theft, and attempted theft, of Trilobio's databases and bank accounts

61.    Gandall changed the passwords to Trilobio's Ledger and Discord databases without authorization and has refused to return access to those databases to Trilobio.

62.    Gandall uploaded all of Trilobio's investor updates to his own personal website without authorization.

63.    Gandall also attempted to access Trilobio's corporate bank account, without authorization, after his termination, on March 30, 2023.

### FIRST CAUSE OF ACTION

### Violation of Computer Fraud and Abuse Act, 18 U.S.C. § 1030

64.    Plaintiff incorporates and realleges all of the above paragraphs as though fully set forth herein.

65.    Trilobio's computer systems are used in affecting interstate commerce and communication and are therefore "protected computers" pursuant to 18 U.S.C. § 1030(e)(2)(B).

SIDEMAN & BANCROFT LLP
LAW OFFICES
ONE EMBARCADERO CENTER 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

66. Trilobio provided Gandall with limited access to Trilobio's computers to conduct business during the time he was an employee of Trilobio and only in his capacity as a Trilobio employee.

67. While employed at Trilobio, Gandall intentionally accessed confidential information, which he was not authorized to access, on Trilobio's computer systems.

68. Gandall also accessed Trilobio's computer systems after he was terminated and no longer authorized to access Trilobio's computer systems at all.

69. Gandall acted knowingly and with the intent to defraud Trilobio by appropriating its confidential information and interfering with its relationships with customers and investors.

70. As a result of Gandall's unauthorized access to Trilobio's computer systems, and his access to Trilobio's computer systems which exceeded his authorized access, Gandall obtained valuable confidential information of Trilobio.

71. As a result of Gandall's unauthorized access to Trilobio's computer systems, and his access to Trilobio's computer systems which exceeded his authorized access, Gandall recklessly caused damage to Trilobio, including the cost of investigating, analyzing, and responding to Gandall's actions.

72. As a result of Gandall's unauthorized access to Trilobio's computer systems Gandall caused damages and loss to Trilobio, including the cost of investigating, analyzing, and responding to Gandall's actions.

73. Gandall's actions herein were done maliciously, oppressively, fraudulently and in bad faith, entitling Trilobio to punitive damages.

## SECOND CAUSE OF ACTION

### (Violation of the Defend Trade Secrets Act, 18 U.S.C §§ 1836, *et seq.*)

74. Plaintiff incorporates and realleges all of the above paragraphs as though fully set forth herein.

75. Trilobio possess trade secrets including, without limitation, the AI BioRobotics Technology and the Oligo Pool Technology.

76.     Trilobio's trade secrets, including the AI BioRobotics Technology and the Oligo Pool Technology are valuable, proprietary information that is not known to the public.

77.     Trilobio protects its trade secrets and intellectual property, including the AI BioRobotics Technology and the Oligo Pool Technology, by, among other things, limiting access to its computer systems, requiring password protections, requiring two-factor identification, tracking passwords to ensure that they are strong, unique, and randomly generated, using software to track all documents sent to potential investors, and designing software architecture to keep software trade secrets on Trilobio servers (and secured through access only possible through an API) or compiled binaries. Additionally all Trilobio employees sign a confidentiality agreement and all potential customers sign non-disclosure agreements.

78.     Gandall misappropriated trade secrets of Trilobio, including the AI BioRobotics Technology and the Oligo Pool Technology.

79.     Gandall held out Trilobio's trade secrets, including the AI BioRobotics Technology and the Oligo Pool Technology, as his own product by, among other things, posting videos and tweets about them and pitching them as his own ideas to potential customers.

80.     Trilobio has suffered and will continue to suffer harm as a result of Gandall's appropriation of its trade secrets, including, without limitation, monetary harm, loss of goodwill, and loss of business opportunities.

81.     Gandall's actions herein were done maliciously, oppressively, fraudulently and in bad faith, entitling Plaintiffs to punitive damages.

## THIRD CAUSE OF ACTION

**(Violation of the California Comprehensive Computer Data Access and Fraud Act, Cal. Pen. Code § 502)**

82.     Plaintiff incorporates and realleges all of the above paragraphs as though fully set forth herein.

83.     Trilobio is the owner of the Trilobio's computers, computer systems, and computer network.

84.    Gandall knowingly accessed Trilobio's computers, computer systems, and computer network.

85.    Gandall, without permission, knowingly took, copied, altered, destroyed, or otherwise used data obtained from such access—data which belongs to Trilobio

86.    Gandall changed Trilobio's passwords to deny Trilobio access to its own information and databases. Gandall also uploaded confidential Trilobio information to his personal website

87.    Gandall knowingly accessed Trilobio's computers, computer systems, and computer network and took, copied, altered, destroyed, or otherwise used data obtained from such access either for the purpose of devising or executing a scheme or artifice to defraud, deceive, or extort, or for the purpose of wrongfully controlling or obtaining money, property, or data.

88.    Gandall's actions herein were done maliciously, oppressively, fraudulently and in bad faith, entitling Trilobio to punitive damages.

## FOURTH CAUSE OF ACTION

### (Violation of California Misappropriation of Trade Secrets Act (Civ. Code §§ 3426 et seq.))

89.    Plaintiff incorporates and realleges all of the above paragraphs as though fully set forth herein.

90.    Trilobio possess trade secrets including, without limitation, the AI BioRobotics Technology and the Oligo Pool Technology.

91.    Trilobio's trade secrets, including the AI BioRobotics Technology and the Oligo Pool Technology are valuable, proprietary information that is not known to the public.

92.    Trilobio protects its trade secrets and intellectual property, including the AI BioRobotics Technology and the Oligo Pool Technology, by, among other things, limiting access to its computer systems, requiring password protections, requiring two-factor identification, tracking passwords to ensure that they are strong, unique, and randomly generated, using software to track all documents sent to potential investors, and designing software architecture to keep software trade secrets on Trilobio servers (and secured through access only possible through an

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

API) or compiled binaries. Additionally all Trilobio employees sign a confidentiality agreement and all potential customers sign non-disclosure agreements.

93.    Gandall misappropriated trade secrets of Trilobio, including the AI BioRobotics Technology and the Oligo Pool Technology.

94.    Gandall held out Trilobio's trade secrets, including the AI BioRobotics Technology and the Oligo Pool Technology, as his own product by, among other things, posting videos and tweets about them and pitching them as his own ideas to potential customers.

95.    Trilobio has suffered and will continue to suffer harm as a result of Gandall's appropriation of its trade secrets, including, without limitation, monetary harm, loss of goodwill, and loss of business opportunities.

96.    Gandall has been unjustly enriched by his misappropriation of Trilobio's trade secrets, including the AI BioRobotics Technology and the Oligo Pool Technology.

97.    Gandall's improper acquisition, disclosure, and use of Trilobio's trade secrets and highly Confidential Information is a substantial factor in both causing Trilobio's harm and the unjust enrichment of Gandall.

98.    Gandall's actions herein were done maliciously, oppressively, fraudulently and in bad faith, entitling Trilobio to punitive damages.

## FIFTH CAUSE OF ACTION

### (Unfair Business Practices (Cal. Bus. & Prof. Code §§ 17200 et seq.))

99.    Plaintiff incorporates and realleges all of the above paragraphs as though fully set forth herein.

100.    California Business and Professions Code §§ 17200 et seq. prohibits acts of unfair competition, which includes any unlawful business act or practice.

101.    Gandall knowingly, willfully, and unlawfully obtained and disclosed Trilobio's sensitive and confidential trade secrets to the public in violation of federal and state statutes, including, but not limited to, the Federal Computer Fraud and Abuse Act, 18 U.S.C. Section 1030, the Federal Defend Trade Secrets Act, 18 U.S.C. Sections 1836 *et seq.,* as well as California's Misappropriation of Trade Secrets Act, Civ. Code Sections 3426 *et seq.*

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

102.    Gandall's actions described above were crimes, in violation of California Penal Code Section 502.

103.    Gandall's efforts to access Trilobio's bank accounts after his termination was also criminal, violating Penal Code sections 487, 664, and 502.

104.    Gandall's misappropriation of trade secrets also constitutes an unfair business practice.

105.    Gandall's unlawful and unfair business practices, caused an injury-in-fact to Trilobio, which has lost profits and property, and suffered loss of business relations, reputation, and goodwill.

106.    Trilobio's remedy at law is not adequate to compensate for the all injuries inflicted by Gandall.

107.    Accordingly, Trilobio is entitled to temporary, preliminary, and permanent injunctive relief against Gandall, in addition to restitution in an amount to be proven at trial.

## SIXTH CAUSE OF ACTION

### (Intentional Interference with Prospective Economic Advantage)

108.    Plaintiff incorporates and realleges all of the above paragraphs as though fully set forth herein.

109.    Trilobio had an economic relationship with investors that likely would have resulted in an economic benefit to Plaintiff.

110.    Gandall knew of these relationships.

111.    Gandall engaged in separate conversations with prospective investors in which he purposefully (1) disclosed his departure from Trilobio and (2) openly shared Trilobio's Confidential Information relating to the Oligo Pool Technology, marketing it as his own idea, in order divert the Prospective Investors business away from Trilobio and to his own company, Nanala.

112.    Gandall, by engaging in this conduct, intended to disrupt the relationship between Trilobio and the Prospective Investors and, in fact, their relationships were disrupted.

113.    Trilobio was harmed by Gandall's conduct.

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

114.    Gandall's actions herein were done maliciously, oppressively, fraudulently and in bad faith, entitling Trilobio to punitive damages.

## SEVENTH CAUSE OF ACTION

### (Fraud - Intentional Misrepresentation)

115.    Plaintiff incorporates and realleges all of the above paragraphs as though fully set forth herein.

116.    Gandall represented to Trilobio that he would be able to support the growth of Trilobio by connecting Trilobio to his professional network at Stanford University, including procuring Professor Endy as an advisor to Trilobio. He further represented that he had the skills, knowledge, and expertise to oversee and/or contribute to the projects at Trilobio.

117.    Gandall's representations regarding his professional and academic network and his ability to oversee and/or contribute to the projects at Trilobio were false or made with reckless disregard for their truth.

118.    Gandall had no intention of asking Professor Endy to serve as an advisor to Trilobio and, in fact, never asked him to do so.

119.    Gandall also lacked the skills to contribute to Trilobio's projects and did not perform to the level he had promised.

120.    Gandall intended for Trilobio to rely on his representation in order to induce Trilobio to hire him.

121.    Trilobio reasonably relied on Gandall's representations.

122.    Trilobio was harmed and Trilobio's reliance on Gandall's representations was a substantial factor in causing that harm.

123.    Gandall's actions herein were done maliciously, oppressively, fraudulently and in bad faith, entitling Trilobio to punitive damages.

## EIGHTH CAUSE OF ACTION

### (Fraud - Concealment)

124.    Plaintiff incorporates and realleges all of the above paragraphs as though fully set forth herein.

125. Gandall was in a fiduciary relationship with Trilobio. Gandall was obligated to disclose certain information and updates related to his job responsibilities.

126. During his employment, Gandall intentionally failed to disclose that (1) he never asked Professor Endy to serve as an advisor to Trilobio, (2) failed to provide truthful updates on projects that he initiated or that were assigned to him by Trilobio, and (3) paid himself more money than he was supposed to and hid that fact from his co-founders.

127. Trilobio was unaware that Gandall had not asked Professor Endy to serve as an advisor and understood that projects led by Gandall were making timely progress because Gandall concealed these facts from Trilobio. Gandall's concealment and misrepresentation was material to Trilobio.

128. Gandall engaged in this concealment with the intent to deceive and defraud Trilobio and Gandall knew that if the concealed information had been disclosed, Trilobio would have terminated his employment.

129. Trilobio was harmed and Gandall's concealment and nondisclosure was a substantial factor in causing Trilobio's harm.

130. Gandall's actions herein were done maliciously, oppressively, fraudulently and in bad faith, entitling Trilobio to punitive damages.

## NINTH CAUSE OF ACTION

### (Constructive Fraud)

131. Plaintiff incorporates and realleges all of the above paragraphs as though fully set forth herein.

132. Gandall was a Chief Financial Officer at Trilobio and had a fiduciary duty towards Trilobio.

133. Gandall knew, or should have known that disclosing confidential and proprietary information about Trilobio, including but not limited to, impressions, concepts, outcomes, methodologies, formulas and ideas related the Oligo Pool Technology and the AI BioRobotics Technology would harm Trilobio.

134. Gandall misled Trilobio by failing to disclose these facts.

135.    Trilobio was harmed by Gandall's wrongful actions and Gandall's conduct was a substantial factor in causing Trilobio's harm.

136.    Gandall's actions herein were done maliciously, oppressively, fraudulently and in bad faith, entitling Trilobio to punitive damages.

**TENTH CAUSE OF ACTION**

**(Negligent Misrepresentation)**

137.    Plaintiff incorporates and realleges all of the above paragraphs as though fully set forth herein.

138.    Gandall represented to Trilobio that he would be able to support the growth of Trilobio by connecting Trilobio to his professional network at Stanford University, including procuring Professor Endy as an advisor to Trilobio. He further represented that he had the skills, knowledge, and expertise to oversee and/or contribute to the projects at Trilobio.

139.    Gandall's representations regarding his professional and academic network and his ability to oversee and/or contribute to the projects at Trilobio were false and he had no reasonable grounds for believing the representations were true when he made them.

140.    Gandall intended Trilobio to rely on his representation in order to induce Trilobio to hire him.

141.    Trilobio's reasonably relied on Gandall's representation.

142.    Due to Gandall's negligent representation, Trilobio was harmed.

**ELEVENTH CAUSE OF ACTION**

**(Breach of Contract)**

143.    Plaintiff incorporates and realleges all of the above paragraphs as though fully set forth herein.

144.    On September 24, 2021 Trilobio and Gandall entered into the CIIAA pursuant to which Gandall agreed not to disclose or disseminate any confidential information of Trilobio, as defined in the CIIAA. Pursuant to Section 4 of the CIIAA, Gandall also agreed to return any and all "devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, laboratory notebooks, materials, flow charts, equipment, other

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

1  documents or property" ("Trilobio's Property") developed by him for Trilobio and belonging to

2  Trilobio, and its successors or assigns.

3      145.   Trilobio did all, or substantially all, of the significant things that it was required to

4  do under the CIIAA.

5      146.   Gandall failed to abide by the non-disclosure requirements of the CIIAA. He

6  disclosed Trilobio's Confidential Information to competitors, investors, prospective investors, and

7  the public at large. Moreover, Gandall also breached the CIIAA when he stole and failed to return

8  Trilobio's Property, including Confidential Information, to the company after his termination.

9      147.   Trilobio was harmed by Gandall's breach of the CIIAA.

10     148.   Gandall's breach of the CIIAA was a substantial factor in harming Trilobio.

11                          **TWELFTH CAUSE OF ACTION**

12                          **(Breach of Fiduciary Duty)**

13     149.   Plaintiff incorporates and realleges all of the above paragraphs as though fully set

14  forth herein.

15     150.   Gandall was an officer of Trilobio and as such bore fiduciary duties to Trilobio.

16     151.   Gandall had access, through the course of his employment, to confidential

17  information pertaining to Trilobio.

18     152.   Gandall disclosed Trilobio's confidential information to Trilobio's competitors,

19  investors, prospective investors, and the public at large. Gandall also used such confidential

20  information for the benefit of his own company, Nanala.

21     153.   The confidential information was not a matter of general knowledge.

22     154.   Trilobio was harmed by Gandall's actions.

23     155.   Gandall's conduct was a substantial factor in causing Trilobio's harm.

24     156.   Gandall's actions herein were done maliciously, oppressively, fraudulently and in

25  bad faith, entitling Trilobio to punitive damages.

26                          **THIRTEENTH CAUSE OF ACTION**

27                          **(Breach of Implied Covenant of Good Faith and Fair Dealing)**

28

SIDEMAN & BANCROFT LLP
LAW OFFICES
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

1    157.    Plaintiff incorporates and realleges all of the above paragraphs as though fully set

2    forth herein.

3    158.    In every contract there is an implied promise of good faith and fair dealing. This

4    implied promise means that each party will not do anything to unfairly interfere with the right of

5    any other party to receive the benefits of the contract. Good faith means honesty of purpose

6    without any intention to mislead or take unfair advantage of another.

7    159.    Trilobio and Gandall entered into the CIIAA on September 24, 2021, which

8    contained certain obligations regarding non-disclosures which were required to be adhered by both

9    parties.

10    160.    Trilobio performed all, or substantially all, of the significant things that the CIIAA

11    required it to do.

12    161.    Gandall failed to abide by the non-disclosure requirements of the CIIAA when he

13    disclosed Trilobio's confidential information and stole and failed to return Trilobio's property to

14    the company upon his termination. Gandall is still in possession of Trilobio's property.

15    162.    Gandall failed to act fairly and in good faith and Trilobio was harmed by Gandall's

16    conduct.

17    163.    Gandall's actions herein were done maliciously, oppressively, fraudulently and in

18    bad faith, entitling Trilobio to punitive damages.

19    **PRAYER FOR RELIEF**

20    **WHEREFORE**, Plaintiff prays that the Court issue the following relief:

21    A.    Preliminary and permanent injunctive relief enjoining Defendant from using or

22    disclosing Trilobio's Confidential Information;

23    B.    Return of all hard copies and electronic documents containing sensitive and

24    confidential information, including trade secrets, owned by Trilobio;

25    C.    Damages in the amount to be determined at trial, including but not limited to actual

26    damages, statutory damages and statutory penalties;

27    D.    Disgorgement of all revenues, profits, enrichment, investment, or other benefits

28    that Defendant received as result of Defendant's wrongful conduct;

1    E.    Constructive trust over all revenues, profits, enrichment, investment, or other

2    benefits that Defendant obtained through use of Plaintiff's intellectual property;

3    F.    Treble damages and disgorgement to the fullest extent available under the law;

4    G.    Punitive and exemplary damages to the fullest extent available under the law;

5    H.    Plaintiffs' attorneys' fees and costs to the fullest extent available under the law; and

6    I.    All other such relief as the Court may deem just, proper and equitable.

7

8    DATED: September 9, 2024                Respectfully submitted,

9                                            SIDEMAN & BANCROFT LLP

10

11

12    By:        /s/Ronald J. Fisher
                 Ronald J. Fisher
13               Attorneys for PLAINTIFFS
                 TRILOBIO, INC.

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

# EXHIBIT A

**TRILOBIO INC**

**CONFIDENTIAL INFORMATION AND
INVENTION ASSIGNMENT AGREEMENT**

*Employee Name:*  **Keoni Gandall**

*Effective Date:*  **September 24, 2021**

As a condition of my becoming employed (or my employment being continued) by Trilobio inc, a Delaware public benefit corporation, or any of its current or future subsidiaries, affiliates, successors or assigns (collectively, the "Company"), and in consideration of my employment with the Company and my receipt of the compensation now and hereafter paid to me by the Company, the receipt of Confidential Information (as defined below) while associated with the Company, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, I agree to the following:

1.    **Relationship.**  This Confidential Information and Invention Assignment Agreement (this "Agreement") will apply to my employment relationship with the Company.  If that relationship ends and the Company, within a year thereafter, either reemploys me or engages me as a consultant, I agree that this Agreement will also apply to such later employment or consulting relationship, unless the Company and I otherwise agree in writing.  Any such employment or consulting relationship between the parties hereto, whether commenced prior to, upon or after the date of this Agreement, is referred to herein as the "Relationship."

2.    **Confidential Information.**

(a)    **Protection of Information.**  I understand that during the Relationship, the Company intends to provide me with information, including Confidential Information (as defined below), without which I would not be able to perform my duties to the Company.  I agree, at all times during the term of the Relationship and thereafter, to hold in strictest confidence, and not to use, except for the benefit of the Company to the extent necessary to perform my obligations to the Company under the Relationship, and not to disclose to any person, firm, corporation or other entity, without written authorization from the Company in each instance, any Confidential Information that I obtain, access or create during the term of the Relationship, whether or not during working hours, until such Confidential Information becomes publicly and widely known and made generally available through no wrongful act of mine or of others who were under confidentiality obligations as to the item or items involved.  I further agree not to make copies of such Confidential Information except as authorized by the Company.

(b)    **Confidential Information.**  I understand that "Confidential Information" means information and physical material not generally known or available outside the Company and information and physical material entrusted to

the Company in confidence by third parties. Confidential Information includes, without limitation: (i) Company Inventions (as defined below); and (ii) technical data, trade secrets, know-how, research, product or service ideas or plans, software codes and designs, algorithms, developments, inventions, patent applications, laboratory notebooks, processes, formulas, techniques, biological materials, mask works, engineering designs and drawings, hardware configuration information, agreements with third parties, lists of, or information relating to, employees and consultants of the Company (including, but not limited to, the names, contact information, jobs, compensation, and expertise of such employees and consultants), lists of, or information relating to, suppliers and customers (including, but not limited to, customers of the Company on whom I called or with whom I became acquainted during the Relationship), price lists, pricing methodologies, cost data, market share data, marketing plans, licenses, contract information, business plans, financial forecasts, historical financial data, budgets or other business information disclosed to me by the Company either directly or indirectly, whether in writing, electronically, orally, or by observation.

(c) **Third Party Information.** My agreements in this Section 2 are intended to be for the benefit of the Company and any third party that has entrusted information or physical material to the Company in confidence. I further agree that, during the term of the Relationship and thereafter, I will not improperly use or disclose to the Company any confidential, proprietary or secret information of my former employer(s) or any other person, and I agree not to bring any such information onto the Company's property or place of business.

(d) **Other Rights.** This Agreement is intended to supplement, and not to supersede, any rights the Company may have in law or equity with respect to the protection of trade secrets or confidential or proprietary information.

(e) **U.S. Defend Trade Secrets Act.** Notwithstanding the foregoing, the U.S. Defend Trade Secrets Act of 2016 ("DTSA") provides that an individual shall not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that is made (i) in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney; and (ii) solely for the purpose of reporting or investigating a suspected violation of law; or (iii) in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal. In addition, DTSA provides that an individual who files a lawsuit for retaliation by an employer for reporting a suspected violation of law may disclose the trade secret to the attorney of the individual and use the trade secret information in the court proceeding, if the individual (A) files any document containing the trade secret under seal; and (B) does not disclose the trade secret, except pursuant to court order.

3.      **Ownership of Inventions.**

(a)      **Inventions Retained and Licensed.**  I have attached hereto, as Exhibit A, a complete list describing with particularity all Inventions (as defined below) that, as of the Effective Date:  (i) I made, and/or (ii) belong solely to me or belong to me jointly with others or in which I have an interest, and that relate in any way to any of the Company's actual or proposed businesses, products, services, or research and development, and which are not assigned to the Company hereunder; or, if no such list is attached, I represent that there are no such Inventions at the time of signing this Agreement, and to the extent such Inventions do exist and are not listed on Exhibit A, I hereby forever waive any and all rights or claims of ownership to such Inventions.  I understand that my listing of any Inventions on Exhibit A does not constitute an acknowledgement by the Company of the existence or extent of such Inventions, nor of my ownership of such Inventions.  I further understand that I must receive the formal approval of the Company before commencing my Relationship with the Company.

(b)      **Use or Incorporation of Inventions.**  If in the course of the Relationship, I use or incorporate into a product, service, process or machine any Invention not covered by Section 3(d) of this Agreement in which I have an interest, I will promptly so inform the Company in writing.  Whether or not I give such notice, I hereby irrevocably grant to the Company a nonexclusive, fully paid-up, royalty-free, assumable, perpetual, worldwide license, with right to transfer and to sublicense, to practice and exploit such Invention and to make, have made, copy, modify, make derivative works of, use, sell, import, and otherwise distribute such Invention under all applicable intellectual property laws without restriction of any kind.

(c)      **Inventions.**  I understand that "Inventions" means discoveries, developments, concepts, designs, ideas, know how, improvements, inventions, trade secrets and/or original works of authorship, whether or not patentable, copyrightable or otherwise legally protectable.  I understand this includes, but is not limited to, any new product, machine, article of manufacture, biological material, method, procedure, process, technique, use, equipment, device, apparatus, system, compound, formulation, composition of matter, design or configuration of any kind, or any improvement thereon.  I understand that "Company Inventions" means any and all Inventions that I may solely or jointly author, discover, develop, conceive, or reduce to practice during the period of the Relationship, except as otherwise provided in Section 3(g) below.

(d)      **Assignment of Company Inventions.**  I hereby assign to the Company, or its designee, and I agree that I will promptly make full written disclosure to the Company of and to hold in trust for the sole right and benefit of the Company, all my right, title and interest throughout the world in and to any and all Company Inventions and all patent, copyright, trademark, trade secret and other intellectual property rights therein.  I hereby waive and irrevocably quitclaim to the Company or its designee any and all claims, of any nature

whatsoever, that I now have or may hereafter have for infringement of any and all Company Inventions. I further acknowledge that all Company Inventions that are made by me (solely or jointly with others) within the scope of and during the period of the Relationship are "works made for hire" (to the greatest extent permitted by applicable law) and are compensated by my salary. Any assignment of Company Inventions includes all rights of attribution, paternity, integrity, modification, disclosure and withdrawal, and any other rights throughout the world that may be known as or referred to as "moral rights," "artist's rights," "droit moral," or the like (collectively, "<u>Moral Rights</u>"). To the extent that Moral Rights cannot be assigned under applicable law, I hereby waive and agree not to enforce any and all Moral Rights, including, without limitation, any limitation on subsequent modification, to the extent permitted under applicable law.

(e)     **Maintenance of Records.** I agree to keep and maintain adequate and current written records of all Company Inventions made or conceived by me (solely or jointly with others) during the term of the Relationship. The records may be in the form of notes, sketches, drawings, flow charts, electronic data or recordings, laboratory notebooks, or any other format. The records will be available to and remain the sole property of the Company at all times. I agree not to remove such records from the Company's place of business except as expressly permitted by Company policy which may, from time to time, be revised at the sole election of the Company for the purpose of furthering the Company's business. I agree to deliver all such records (including any copies thereof) to the Company at the time of termination of the Relationship as provided for in Sections 4 and 5.

(f)     **Patent and Copyright Rights.** I agree to assist the Company, or its designee, at its expense, in every proper way to secure the Company's, or its designee's, rights in the Company Inventions and any copyrights, patents, trademarks, mask work rights, Moral Rights, or other intellectual property rights relating thereto in any and all countries, including the disclosure to the Company or its designee of all pertinent information and data with respect thereto, the execution of all applications, specifications, oaths, assignments, recordations, and all other instruments which the Company or its designee shall deem necessary in order to apply for, obtain, maintain and transfer such rights, or if not transferable, waive and agree never to assert such rights, and in order to assign and convey to the Company or its designee, and any successors, assigns and nominees the sole and exclusive right, title and interest in and to such Company Inventions, and any copyrights, patents, mask work rights or other intellectual property rights relating thereto. I further agree that my obligation to execute or cause to be executed, when it is in my power to do so, any such instrument or papers shall continue during and at all times after the end of the Relationship and until the expiration of the last such intellectual property right to expire in any country of the world. I hereby irrevocably designate and appoint the Company and its duly authorized officers and agents as my agent and attorney-in-fact, to act for and in my behalf and stead to execute and file any such instruments and papers and to do all other lawfully permitted acts to further the application

-4-

for, prosecution, issuance, maintenance or transfer of letters patent, copyright, mask work and other registrations related to such Company Inventions. This power of attorney is coupled with an interest and shall not be affected by my subsequent incapacity.

(g) **Exception to Assignments.** Subject to the requirements of applicable state law, if any, I understand that the Company Inventions will not include, and the provisions of this Agreement requiring assignment of inventions to the Company do not apply to, any invention which qualifies fully for exclusion under the provisions of applicable state law, if any, attached hereto as Exhibit B. In order to assist in the determination of which inventions qualify for such exclusion, I will advise the Company promptly in writing, during and for a period of twelve (12) months immediately following the termination of the Relationship, of all Inventions solely or jointly conceived or developed or reduced to practice by me during the period of the Relationship.

4. **Company Property; Returning Company Documents.** I acknowledge and agree that I have no expectation of privacy with respect to the Company's telecommunications, networking or information processing systems (including, without limitation, files, e-mail messages, and voice messages) and that my activity and any files or messages on or using any of those systems may be monitored or reviewed at any time without notice. I further agree that any property situated on the Company's premises and owned by the Company, including disks and other storage media, filing cabinets or other work areas, is subject to inspection by Company personnel at any time with or without notice. I agree that, at the time of termination of the Relationship, I will deliver to the Company (and will not keep in my possession, recreate or deliver to anyone else) any and all devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, laboratory notebooks, materials, flow charts, equipment, other documents or property, or reproductions of any of the aforementioned items developed by me pursuant to the Relationship or otherwise belonging to the Company, its successors or assigns.

5. **Termination Certification.** In the event of the termination of the Relationship, I agree to sign and deliver the "Termination Certification" attached hereto as Exhibit C; however, my failure to sign and deliver the Termination Certification shall in no way diminish my continuing obligations under this Agreement.

6. **Notice to Third Parties.** I agree that during the periods of time during which I am restricted in taking certain actions by the terms of this Agreement (the "Restriction Period"), I shall inform any entity or person with whom I may seek to enter into a business relationship (whether as an owner, employee, independent contractor or otherwise) of my contractual obligations under this Agreement. I also understand and agree that the Company may, with or without prior notice to me and during or after the term of the Relationship, notify third parties of my agreements and obligations under this Agreement. I further agree that, upon written request by the Company, I will respond to the Company in writing regarding the status of my employment or proposed employment with any party during the Restriction Period.

7.    **Solicitation of Employees, Consultants and Other Parties.** As described above, I acknowledge and agree that the Company's Confidential Information includes information relating to the Company's employees, consultants, customers and others, and that I will not use or disclose such Confidential Information except as authorized by the Company. I further agree as follows:

        (a)    **Employees, Consultants.** I agree that during the term of the Relationship, and for a period of twelve (12) months immediately following the termination of the Relationship for any reason, whether with or without cause, I shall not, directly or indirectly, solicit any of the Company's employees or consultants to terminate their relationship with the Company, or attempt to solicit employees or consultants of the Company, either for myself or for any other person or entity.

        (b)    **Other Parties.** I agree that during the term of the Relationship, I will not negatively influence any of the Company's clients, licensors, licensees or customers from purchasing Company products or services or solicit or influence or attempt to influence any client, licensor, licensee, customer or other person either directly or indirectly, to direct any purchase of products and/or services to any person, firm, corporation, institution or other entity in competition with the business of the Company.

8.    **At-Will Relationship.** I understand and acknowledge that, except as may be otherwise explicitly provided in a separate written agreement between the Company and me, my Relationship with the Company is and shall continue to be at-will, as defined under applicable law, meaning that either I or the Company may terminate the Relationship at any time for any reason or no reason, without further obligation or liability, other than those provisions of this Agreement that explicitly continue in effect after the termination of the Relationship.

9.    **Representations and Covenants.**

        (a)    **Facilitation of Agreement.** I agree to execute promptly, both during and after the end of the Relationship, any proper oath, and to verify any proper document, required to carry out the terms of this Agreement, upon the Company's written request to do so.

        (b)    **No Conflicts.** I represent that my performance of all the terms of this Agreement does not and will not breach any agreement I have entered into, or will enter into, with any third party, including without limitation any agreement to keep in confidence proprietary information or materials acquired by me in confidence or in trust prior to or during the Relationship. I will not disclose to the Company or use any inventions, confidential or non-public proprietary information or material belonging to any previous client, employer or any other party. I will not induce the Company to use any inventions, confidential or non-public proprietary information, or material belonging to any previous client, employer or any other party. I acknowledge and agree that I have listed on

Exhibit A all agreements (*e.g.,* non-competition agreements, non-solicitation of customers agreements, non-solicitation of employees agreements, confidentiality agreements, inventions agreements, etc.), if any, with a current or former client, employer, or any other person or entity, that may restrict my ability to accept employment with the Company or my ability to recruit or engage customers or service providers on behalf of the Company, or otherwise relate to or restrict my ability to perform my duties for the Company or any obligation I may have to the Company.  I agree not to enter into any written or oral agreement that conflicts with the provisions of this Agreement.

(c)      **Voluntary Execution.**  I certify and acknowledge that I have carefully read all of the provisions of this Agreement, that I understand and have voluntarily accepted such provisions, and that I will fully and faithfully comply with such provisions.

10.      **Electronic Delivery.**  Nothing herein is intended to imply a right to participate in any of the Company's equity incentive plans, however, if I do participate in such plan(s), the Company may, in its sole discretion, decide to deliver any documents related to my participation in the Company's equity incentive plan(s) by electronic means or to request my consent to participate in such plan(s) by electronic means.  I hereby consent to receive such documents by electronic delivery and agree, if applicable, to participate in such plan(s) through an on-line or electronic system established and maintained by the Company or a third party designated by the Company.

11.      **Miscellaneous.**

(a)      **Governing Law.**  The validity, interpretation, construction and performance of this Agreement, and all acts and transactions pursuant hereto and the rights and obligations of the parties hereto shall be governed, construed and interpreted in accordance with the laws of the State of California, without giving effect to the principles of conflict of laws.

(b)      **Entire Agreement.**  This Agreement sets forth the entire agreement and understanding between the Company and me relating to its subject matter and merges all prior discussions between us.  No amendment to this Agreement will be effective unless in writing signed by both parties to this Agreement.  The Company shall not be deemed hereby to have waived any rights or remedies it may have in law or equity, nor to have given any authorizations or waived any of its rights under this Agreement, unless, and only to the extent, it does so by a specific writing signed by a duly authorized officer of the Company, it being understood that, even if I am an officer of the Company, I will not have authority to give any such authorizations or waivers for the Company under this Agreement without specific approval by the Board of Directors.  Any subsequent change or changes in my duties, obligations, rights or compensation will not affect the validity or scope of this Agreement.

(c)    **Successors and Assigns.**  This Agreement will be binding upon my heirs, executors, administrators and other legal representatives, and my successors and assigns, and will be for the benefit of the Company, its successors, and its assigns.

(d)    **Notices.**  Any notice, demand or request required or permitted to be given under this Agreement shall be in writing and shall be deemed sufficient when delivered personally or by overnight courier or sent by email, or 48 hours after being deposited in the U.S. mail as certified or registered mail with postage prepaid, addressed to the party to be notified at such party's address as set forth on the signature page, as subsequently modified by written notice, or if no address is specified on the signature page, at the most recent address set forth in the Company's books and records.

(e)    **Severability.**  If one or more of the provisions in this Agreement are deemed void or unenforceable to any extent in any context, such provisions shall nevertheless be enforced to the fullest extent allowed by law in that and other contexts, and the validity and force of the remainder of this Agreement shall not be affected.  The Company and I have attempted to limit my right to use, maintain and disclose the Company's Confidential Information, and to limit my right to solicit employees and customers only to the extent necessary to protect the Company from unfair competition.  Should a court of competent jurisdiction determine that the scope of the covenants contained in Section 7 exceeds the maximum restrictiveness such court deems reasonable and enforceable, the parties intend that the court should reform, modify and enforce the provision to such narrower scope as it determines to be reasonable and enforceable under the circumstances existing at that time.

(f)    **Remedies.**  I acknowledge and agree that violation of this Agreement by me may cause the Company irreparable harm, and therefore I agree that the Company will be entitled to seek extraordinary relief in court, including, but not limited to, temporary restraining orders, preliminary injunctions and permanent injunctions without the necessity of posting a bond or other security (or, where such a bond or security is required, I agree that a $1,000 bond will be adequate), in addition to and without prejudice to any other rights or remedies that the Company may have for a breach of this Agreement.

(g)    **Advice of Counsel.**  I ACKNOWLEDGE THAT, IN EXECUTING THIS AGREEMENT, I HAVE HAD THE OPPORTUNITY TO SEEK THE ADVICE OF INDEPENDENT LEGAL COUNSEL, AND I HAVE READ AND UNDERSTOOD ALL OF THE TERMS AND PROVISIONS OF THIS AGREEMENT.  THIS AGREEMENT SHALL NOT BE CONSTRUED AGAINST ANY PARTY BY REASON OF THE DRAFTING OR PREPARATION HEREOF.

(h)    **Counterparts.**  This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be

deemed an original, and all of which together shall constitute one and the same agreement.

*[Signature Page Follows]*

The parties have executed this Agreement on the respective dates set forth below, to be effective as of the Effective Date first above written.

**THE COMPANY:**

**TRILOBIO INC**

E-signed using Clerky (86338f10fd883d235b719a6106ffb17)

By: *Keoni Gandall*

Keoni Gandall, Mr

koeng101@gmail.com

The parties have executed this Agreement on the respective dates set forth below, to be effective as of the Effective Date first above written.

**EMPLOYEE:**

**KEONI GANDALL**

E-signed using Clerky (997424b46165873fe32e1359dccf3cdf)

*Keoni Gandall*

9082 Pioneer Drive
Huntington Beach, CA 92646

7146420892 (phone)

koeng101@gmail.com

## EXHIBIT A

**LIST OF PRIOR INVENTIONS
AND ORIGINAL WORKS OF AUTHORSHIP
EXCLUDED UNDER SECTION 3(a) AND CONFLICTING AGREEMENTS
DISCLOSED UNDER SECTION 9(b)**

The following is a list of (i) all Inventions that, as of the Effective Date:  (A) I made, and/or (B) belong solely to me or belong to me jointly with others or in which I have an interest, and that relate in any way to any of the Company's actual or proposed businesses, products, services, or research and development, and which are not assigned to the Company and (ii) all agreements, if any, with a current or former client, employer, or any other person or entity, that may restrict my ability to accept employment with the Company or my ability to recruit or engage customers or service providers on behalf of the Company, or otherwise relate to or restrict my ability to perform my duties for the Company or any obligation I may have to the Company:

Prior Inventions:
      None

Prior Agreements:
      None

*[Signature Page Follows]*

Except as indicated above on this Exhibit A, I have no inventions, improvements or original works to disclose pursuant to Section 3(a) of this Agreement and no agreements to disclose pursuant to Section 9(b) of this Agreement.

**EMPLOYEE:**

**KEONI GANDALL**

E-signed using Clerky (997424b46165873fe32a1359dccf3cdf)

_Keoni Gandall_

9082 Pioneer Drive
Huntington Beach, CA 92646

7146420892 (phone)

koeng101@gmail.com

## EXHIBIT B

**Section 2870 of the California Labor Code is as follows:**

(a)    Any provision in an employment agreement which provides that an employee shall assign, or offer to assign, any of his or her rights in an invention to his or her employer shall not apply to an invention that the employee developed entirely on his or her own time without using the employer's equipment, supplies, facilities, or trade secret information except for those inventions that either:

(1)    Relate at the time of conception or reduction to practice of the invention to the employer's business, or actual or demonstrably anticipated research or development of the employer; or

(2)    Result from any work performed by the employee for the employer.

(b)    To the extent a provision in an employment agreement purports to require an employee to assign an invention otherwise excluded from being required to be assigned under subdivision (a), the provision is against the public policy of this state and is unenforceable.

**Chapter 765, Section 1060/2 of the Illinois Compiled Statutes is as follows:**

(1)    A provision in an employment agreement which provides that an employee shall assign or offer to assign any of the employee's rights in an invention to the employer does not apply to an invention for which no equipment, supplies, facilities, or trade secret information of the employer was used and which was developed entirely on the employee's own time, unless (a) the invention relates (i) to the business of the employer, or (ii) to the employer's actual or demonstrably anticipated research or development, or (b) the invention results from any work performed by the employee for the employer. Any provision which purports to apply to such an invention is to that extent against the public policy of this State and is to that extent void and unenforceable. The employee shall bear the burden of proof in establishing that his invention qualifies under this subsection.

(2)    An employer shall not require a provision made void and unenforceable by subsection (1) of this Section as a condition of employment or continuing employment. This Act shall not preempt existing common law applicable to any shop rights of employers with respect to employees who have not signed an employment agreement.

(3)    If an employment agreement entered into after January 1, 1984, contains a provision requiring the employee to assign any of the employee's rights in any invention to the employer, the employer must also, at the time the agreement is made, provide a written notification to the employee that the agreement does not apply to an invention for which no equipment, supplies, facility, or trade secret information of the employer was used and which was developed entirely on the employee's own time, unless (a) the invention relates (i) to the business of the employer, or (ii) to the employer's actual or

demonstrably anticipated research or development, or (b) the invention results from any work performed by the employee for the employer.

**Sections 44-130 of the Kansas Labor and Industries Code is as follows:**

(a)    Any provision in an employment agreement which provides that an employee shall assign or offer to assign any of the employee's rights in an invention to the employer shall not apply to an invention for which no equipment, supplies, facilities or trade secret information of the employer was used and which was developed entirely on the employee's own time, unless:

    (1)    The invention relates to the business of the employer or to the employer's actual or demonstrably anticipated research or development; or

    (2)    the invention results from any work performed by the employee for the employer.

(b)    Any provision in an employment agreement which purports to apply to an invention which it is prohibited from applying to under subsection (a), is to that extent against the public policy of this state and is to that extent void and unenforceable. No employer shall require a provision made void and unenforceable by this section as a condition of employment or continuing employment.

**Section 181.78, Subdivision 3 of the Minnesota Labor, Industry Code is as follows:**

(c)    If an employment agreement contains a provision requiring the employee to assign any of the employee's rights in any invention to the employer, the employer shall provide, at the time the agreement is made, a written notification to the employee that the agreement does not apply to an invention for which no equipment, supplies, facility or trade secret information of the employer was used and which was developed entirely on the employee's own time, unless:

    (1)    The invention relates directly to the business of the employer or to the employer's actual or demonstrably anticipated research or development; or

    (2)    The invention results from any work performed by the employee for the employer.

(d)    Even though the employee meets the burden of proving the conditions specified in this section, the employee shall disclose, at the time of employment or thereafter, all inventions being developed by the employee, for the purpose of determining employer and employee rights in an invention.

**Section 49.44.140 of the Revised Code of Washington is as follows:**

(1)    A provision in an employment agreement which provides that an employee shall assign or offer to assign any of the employee's rights in an invention to the employer does not apply to an invention for which no equipment, supplies, facilities, or trade secret information of the employer was used and which was developed entirely on the employee's own time, unless (a) the invention relates (i) directly to the business of the employer, or (ii) to the employer's actual or demonstrably anticipated research or development, or (b) the invention results from any work performed by the employee for the employer. Any provision which purports to apply to such an invention is to that extent against the public policy of this state and is to that extent void and unenforceable.

(2)    An employer shall not require a provision made void and unenforceable by subsection (1) of this section as a condition of employment or continuing employment.

(3)    If an employment agreement entered into after September 1, 1979, contains a provision requiring the employee to assign any of the employee's rights in any invention to the employer, the employer must also, at the time the agreement is made, provide a written notification to the employee that the agreement does not apply to an invention for which no equipment, supplies, facility, or trade secret information of the employer was used and which was developed entirely on the employee's own time, unless (a) the invention relates (i) directly to the business of the employer, or (ii) to the employer's actual or demonstrably anticipated research or development, or (b) the invention results from any work performed by the employee for the employer.

## EXHIBIT C

### TERMINATION CERTIFICATION

This is to certify that I do not have in my possession, nor have I failed to return, any devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, laboratory notebooks, flow charts, materials, equipment, other documents or property, or copies or reproductions of any aforementioned items belonging to Trilobio inc, a Delaware public benefit corporation, its subsidiaries, affiliates, successors or assigns (collectively, the "Company").

I further certify that I have complied with all the terms of the Company's Confidential Information and Invention Assignment Agreement signed by me, including the reporting of any Inventions (as defined therein), conceived or made by me (solely or jointly with others) covered by that agreement, and I acknowledge my continuing obligations under that agreement.

I further agree that, in compliance with the Confidential Information and Invention Assignment Agreement, I will preserve as confidential all trade secrets, confidential knowledge, data or other proprietary information relating to products, processes, know-how, designs, formulas, developmental or experimental work, computer programs, data bases, other original works of authorship, customer lists, business plans, financial information or other subject matter pertaining to any business of the Company or any of its employees, clients, consultants or licensees.

I further agree that for twelve (12) months immediately following the termination of my Relationship with the Company, I shall not either directly or indirectly solicit any of the Company's employees or consultants to terminate their relationship with the Company, or attempt to solicit employees or consultants of the Company, either for myself or for any other person or entity.

Further, I agree that I shall not use any Confidential Information of the Company to negatively influence any of the Company's clients or customers from purchasing Company products or services or to solicit or influence or attempt to influence any client, customer or other person either directly or indirectly, to direct any purchase of products and/or services to any person, firm, corporation, institution or other entity in competition with the business of the Company.

**EMPLOYEE:** Keoni Gandall

Signature: _____    Date: _____